

FILED

2012 JUN -1  PM 1:40

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY:_____

1   Benjamin Schonbrun, SBN 118323
SCHONBRUN DESIMONE SEPLOW
2   HARRIS HOFFMAN & HARRISON LLP
723 Ocean Front Walk
3   Venice, California 90291
Telephone:  (310) 396-0731
4   Fax:  (310) 399-7040

5   Dan Getman
Leslie Tse
6   GETMAN & SWEENEY, PLLC
9 Paradise Lane
7   New Paltz, New York 12561
Telephone: 845-255-9370
8   Fax: 845-255-8649

9   Susan Martin
Daniel Bonnett
10   Jennifer Kroll
MARTIN & BONNETT, PLLC
11   1850 N. Central Ave., Suite 2010
Phoenix, Arizona 85004
12   Telephone: 602-240-6900
Fax: 602-240-2345

13   Edward Tuddenham
228 W. 137th St.
14   New York, New York 10030
Telephone: 212-234-5953
15   Fax: 512-532-7780

16   Attorneys for Plaintiffs

17            UNITED STATES DISTRICT COURT

18          CENTRAL DISTRICT OF CALIFORNIA

19          ED  CV 12 - 00886    VAP
                                        (OPx)
20   GABRIEL CILLUFFO, KEVIN SHIRE,
and BRYAN RATTERREE individually
21   and behalf of all other similarly situated
persons,

22                    Plaintiffs,        COLLECTIVE & CLASS
                                        ACTION COMPLAINT
23   vs.

24
CENTRAL REFRIGERATED
25   SERVICES, INC., CENTRAL LEASING,
INC., JON ISAACSON, and JERRY
26   MOYES,

27                    Defendants

28

## COLLECTIVE & CLASS ACTION COMPLAINT

1.      Defendants CENTRAL REFRIGERATED SERVICE, INC ("CRS") and CENTRAL LEASING, INC. ("CLI") are private companies, owned and operated by related individuals (including JON ISAACSON and JERRY MOYES) for a common business purpose, i.e. moving freight interstate for customers of CRS.

2.      Plaintiffs are current and former drivers who are lured into a scheme by which:

a) Defendants treat Plaintiffs as "independent contractors" (also known as "owner operators"), even though Defendants will exert control over every aspect of Plaintiffs' work,

b) Defendants will lease trucks to Plaintiffs for exclusive re-lease back to CRS,

c) Plaintiffs cannot drive their leased truck for any other company,

d) Plaintiffs bear virtually all expenses required to deliver Defendants' freight, and

e) Defendants coerce Plaintiffs to continue driving trucks for the Defendants for years at a time under threat of crushing financial debt and fear that they will lose the ability to work in the trucking industry again should they leave their employment with Defendants.

3.      This case seeks redress under the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* for Defendants' failure to pay Plaintiffs minimum wages through misclassification of Plaintiff drivers as "independent contractors" when by law they are employees. This case also seeks redress under the Federal Forced Labor statute, 29 U.S.C. §1589, for Defendants' scheme to tie the drivers treated as independent contractors to labor for Defendants for years under threat of serious harm.

4.      Despite the characterization of drivers as independent contractors, CRS exercises virtually the same control over "owner operators" as it does over its

1    employee drivers.

2       5.    The Defendants' characterization of CRS's employee workforce as
3    independent contractors  is the centerpiece of a labor scheme crafted to allow CRS
4    to charge its employees for the opportunity to work, shift virtually all of its business
5    expenses and business risk to its drivers, coerce drivers into remaining with CRS
6    for years at a time under threat of serious financial harm; defeat all federal and state
7    protections for employees, such as Title VII, FMLA, NLRA and wage protection
8    statutes such as the FLSA and similar state laws. By misclassifying drivers,
9    Defendants also evade the tax burdens that it would bear for employees – Social
10   Security, FUTA, etc. – which are also shifted to the Plaintiff drivers.

11      6.    To implement this scheme, CRS and CLI provide the Plaintiff truck
12   drivers an integrated series of forms, the Equipment Lease Agreement ("Lease")
13   and Contractor Agreement ("Contract"), referred to here collectively as
14   "Agreements." CRS and CLI provide the Agreement on a "take it or leave it" basis
15   that must be signed at the time they are provided to the Plaintiffs.

16      7.    Although there is language in Defendants' Lease that appears to permit
17   Plaintiffs to work for other trucking companies, in fact, Defendants' Contract
18   specifically prohibits Plaintiffs from doing so. In addition, when signing the lease,
19   Defendant CLI repeatedly verbally emphasizes that Plaintiffs cannot take the truck
20   to another trucking company.

21      8.    Defendants do not warranty the trucks that they lease to Plaintiffs and
22   do not guarantee Plaintiffs any amount of work.

23      9.    Defendants jointly control Plaintiffs' work and, by law, employ the
24   Plaintiffs to transport goods by truck for CRS's customers. Defendants control
25   when, where, and how Plaintiffs deliver freight. They also control the equipment
26   that Plaintiffs use, including, its operation, maintenance, and condition. Defendants
27   control the amount of hours that Plaintiffs may drive in a week, thereby controlling
28   how much money they can make. Defendants attach a "speed governor" to the

1    trucks they lease to Plaintiffs, so that CRS even controls the speed at which

2    Plaintiffs may drive. Defendants control virtually every aspect of Plaintiffs'

3    performance of CRS's work and the equipment that Plaintiffs use for that work.

4      10. Even though Defendants act as Plaintiffs' employers by law,

5    Defendants benefit greatly by misclassifying Plaintiffs as independent contractors.

6    Plaintiffs fund Defendants' fleet inventory. Defendants charge Plaintiffs tens of

7    thousands of dollars per year for the lease of Defendants' trucks, and they also

8    require Plaintiffs to pay for other equipment, gas, tolls, insurance, bonding, repairs

9    and maintenance, among other items. Defendants charge Plaintiffs directly for a

10   wide variety of employer expenses.

11     11. By misclassifying Plaintiff drivers as independent contractors,

12   Defendants obtain a vast competitive advantage over competitor trucking

13   companies that treat their drivers as employees in compliance with the law.

14   Defendants' pay practices drive down trucker wages across the industry and

15   undercut fair labor practices across the country.

16     12. Defendants force Plaintiffs to labor for them for years at a time, under

17   terms that employees would never be bound to follow. Specifically, Defendants

18   prohibit Plaintiffs from using the truck they lease to drive for other trucking

19   companies. Defendants let Drivers know that if they refuse to work for Defendants

20   during the term of the Agreements, Defendants will treat the Driver as in "default,"

21   Defendants will repossess the leased truck, accelerate all remaining lease payments,

22   thereby imposing crushing debt on the Driver, ruin the Driver's credit rating, and

23   file a negative entry on the Plaintiff Driver's "DAC Report" which is universally

24   used in the trucking industry as a pre-employment screening tool, thereby making it

25   virtually impossible to obtain work as a truck driver again. Defendants also threaten

26   to take these actions if Plaintiffs displease the Defendants or refuse to follow

27   Defendants' work instructions.

28     13. Even though Plaintiffs are tied to working for the Defendants for

1  years, CRS reserves the right to terminate its Contract with Plaintiffs at any time it

2  chooses, which is then contractually defined as a "default" of CLI's Lease by the

3  Driver. Upon characterizing the Defendant's acts as a Plaintiff Driver's default,

4  Defendants immediately repossess the truck and also accelerate the remaining

5  Lease payments and CLI's lost profits which become immediately due and owing.

6  Since a lease for a new truck can cost a Plaintiff over $100,000, Defendants have

7  the unilateral power to subject Plaintiffs to crushing financial consequences, for any

8  reason or for no reason at all.

9      14.    Thus, upon termination of the Contract, Defendants claim they may

10  reap windfall profits, further penalize Plaintiffs, and even prevent Plaintiffs from

11  earning a living using the leased truck – the essential tool of Plaintiffs' trade --

12  while concurrently demanding excessive and unreasonable liquidated damages

13  upon "default."

14      15.    Defendants' ability to put Plaintiffs in default of the Lease at any time

15  provides Defendants with further means to maintain exclusive control over the

16  Drivers' work, and forces Drivers to accept changes to the Contract or Lease

17  imposed unilaterally by Defendants.

18      16.    Thus, even though the Contract provides that either party may

19  terminate the Contract, Plaintiffs cannot reasonably do so, because to do so also

20  would trigger a "default" of the Lease resulting in the same severe financial

21  penalties as if Defendant had terminated the Contract.

22      17.    Plaintiffs are thereby forced to endure working under Defendants'

23  exclusive control for leases lasting as long as three years, even when they are being

24  paid sub-minimum wages, while Defendants on the other hand, may fire Plaintiffs

25  at any time, while calling that termination a "default" by the driver, and even exact

26  further profits from doing so.

27                        **JURISDICTION AND VENUE**

28      18.    Jurisdiction is conferred upon this Court by 29 U.S.C. §216(b) of the

1   Fair Labor Standards Act, by 28 U.S.C. §1331, this action arising under laws of the
2   United States, and by 28 U.S.C. §1337, this action arising under Acts of Congress
3   regulating commerce. Jurisdiction over Plaintiffs' claims for declaratory relief is
4   conferred by 28 U.S.C. §§2201 and 2202.

5          19.    Plaintiffs' claims involve matters of national or interstate interest.

6          20.    Defendants conduct business in this District. Defendants maintain
7   facilities for the conduct of business within the Central District of California. One
8   of Defendants' four terminals in the United States is located in Fontana, California,
9   within the Central District of California. Defendant employs terminal managers and
10  dispatchers in the Central District of California. Defendant maintains facilities in
11  the Central District of California at which drivers can have repairs and maintenance
12  performed on their trucks, park their trucks, park their trailers for swapping out
13  loads, and obtain fuel. Defendants have a company-sponsored CDL training facility
14  in the Central District of California. The named Plaintiff drivers drive for
15  Defendants into and out of the Fontana terminal and deliver freight for Defendants
16  through and to the Central District of California.

17         21.    Venue is proper in the Central District of California, pursuant to 28
18  U.S.C. § 1391, because a substantial part of the events or omissions giving rise to
19  the claim occurred in this District, one Plaintiff and at least one Defendant reside in
20  this District.

21                                **PARTIES**
22  **A.     Plaintiffs**

23         22.    Plaintiff GABRIEL CILLUFFO is a natural person residing in
24  Highland California. CILLUFFO leased a truck from Defendants and signed
25  Defendants' form Agreements. As a matter of law, Plaintiff CILLUFFO was an
26  employee of Defendants as described herein. Plaintiff CILLUFFO worked for
27  Defendants in California and other states.

28         23.    Plaintiff KEVIN SHIRE is a natural person residing at 890 Norse

1   Avenue, Sacramento CA 95864. Plaintiff SHIRE leased a truck from Defendants

2   and signed Defendants' form Agreements. As a matter of law, Plaintiff SHIRE was

3   an employee of Defendants as described herein. Plaintiff Shire worked for

4   Defendants out of the Fontana, California terminal and drove for Defendants in

5   California and other states.

6       24.    Plaintiff BRYAN RATTERREE is a natural person residing in the

7   state of Washington. RATTERREE leased a truck from Defendants and signed

8   Defendants' form Agreements. As a matter of law, Plaintiff RATTERREE was an

9   employee of Defendants as described herein. Plaintiff RATTERREE worked for

10   Defendants out of the Fontana California terminal and drove for Defendants in

11   California and other states...

12       25.    Plaintiffs were engaged in commerce in their work for Defendants.

13       26.    The Named Plaintiffs bring claims under the Fair Labor Standards Act,

14   individually and on behalf of a collective action class as further described herein.

15       27.    The Named Plaintiffs bring claims under the Federal Forced Labor

16   Statutes, 18 U.S.C. §§ 1589 and 1595, individually and on behalf of a FORCED

17   LABOR class, under Fed. R. Civ. P. Rule 23, as further described herein.

18       **B.**    **The FLSA Collective Action Class**

19       28.    The term "Plaintiff" or "Plaintiffs" as used in this Complaint refers to

20   the named Plaintiffs and any additional represented Class Members pursuant to the

21   collective action provision of 29 U.S.C. §216(b). The named Plaintiffs bring this

22   case under the collective action provision of the FLSA as set forth in 29 U.S.C.

23   §216(b) on behalf of themselves and a class of persons throughout the U.S.

24   consisting of "all truckers who lease a truck from Central Leasing, Inc. to drive for

25   CENTRAL REFRIGERATED SERVICE, Inc. during the three years preceding the

26   filing of the initial complaint and up through the date of final judgment herein and

27   subject to any equitable tolling for any applicable portion of the limitation period."

28       29.    Excluded from any Collective Action Class are Defendants' legal

1 representatives, officers, directors, assigns, and successors, or any individual who
2 has, or who at any time during the class period has had, a controlling interest in any
3 Defendants.

4 **C.    The Rule 23 Forced Labor Class**

5     30.    The Second Cause of Action is properly maintainable as a class action
6 under Federal Rule of Civil Procedure 23(b)(3). There are questions of law and fact
7 common to the Forced Labor Class that predominate over any questions solely
8 affecting individual members of the Class and that will  be resolved by common
9 answers including but not limited to:

10     a.    Whether Defendants are or were Plaintiffs' employers;

11     b.    Whether Defendants' scheme, caused Plaintiffs to engage in forced
12 labor for Defendants in violation of the federal forced labor statutes;

13     c.    The nature and extent of Class-wide injury and the appropriate
14 measure of damages for the Classes.

15     31.    The claims of Plaintiffs are typical of the claims of the Class they seek
16 to represent. Plaintiffs and the Class members work or have worked for Defendants
17 and have been subjected to a common policy, practice and scheme that forces
18 Plaintiffs to work for Defendants for long periods of time under threat of serious
19 harm. Defendants acted and refused to act on grounds generally applicable to the
20 Class, thereby making declaratory relief with respect to the Class appropriate.

21     32.    Plaintiffs will fairly and adequately represent and protect the interests
22 of the Class.

23     a.    Plaintiffs understand that, as class representatives, they assume a
24 fiduciary responsibility to the Class to represent its interests fairly and
25 adequately.

26     b.    Plaintiffs recognize that as class representatives, they must represent
27 and consider the interests of the Class just as they would represent and
28 consider their own interests.

c.    Plaintiffs understand that in decisions regarding the conduct of the litigation and its possible settlement, they must not favor their own interests over those of the Class.

d.    Plaintiffs recognize that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the Class.

e.    Plaintiffs understand that to provide adequate representation, they must remain informed of developments in the litigation, cooperate with class counsel by providing them with information and any relevant documentary material in their possession, and testify, if required, in a deposition and in trial.

33.    Plaintiffs have retained counsel competent and experienced in complex class action employment litigation.

34.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation - particularly in the context of wage litigation like the present action, where individual Plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against one of the larger truckload carriers in the United States. The members of the Class have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures. In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

**D.    Defendants**

35.    Upon information and belief, Defendants are related business corporations having an office and place of business in Utah.

36.    Defendant CRS is a privately owned Nebraska corporation with its principal office address at 5175 W 2100 S West Valley City, UT 84120.

37.    Defendant CRS is a motor carrier, engaged in interstate shipment of

1   freight.

2   38.   Defendant CLI is a privately owned Nevada corporation with its

3   principal address at 5175 W 2100 S West Valley City, UT 84120.

4   39.   Defendant CLI has an office and place of business at the very same

5   location as CRS.

6   40.   Defendant CLI is related to CRS. It leases trucks to truckers who will

7   drive for CRS. It requires truckers who sign Leases to sign Contracts with CRS.

8   41.   Defendant CLI leases trucks to CRS employees for the purpose of

9   helping CRS further its shipping business.

10   42.   Upon information and belief, trucks leased to Plaintiffs through CLI

11   are registered with the state department of motor vehicles to CRS.

12   43.   Upon information and belief, CLI and CRS are owned and operated by

13   same principal shareholders or their relatives.

14   44.   Upon information and belief, CLI and CRS have interlocking and

15   overlapping officers and directors.

16   45.   JON ISAACSON is the Chief Executive Officer of both CLI and CRS

17   and, upon information and belief, has an ownership interest in both companies.

18   46.   Upon information and belief, Defendant ISAACSON maintains offices

19   for his work with both CRS and CLI at the headquarters address for both

20   companies, 5175 W 2100 S West Valley City UT 84120.

21   47.   JERRY MOYES is the Director of CRS and, upon information and

22   belief, has an ownership interest in both companies.

23   48.   Upon information and belief, Defendant MOYES maintains offices for

24   his work at the headquarters address for both Defendant companies, 5175 W 2100 S

25   West Valley City UT 84120.

26   49.   Defendants conduct business throughout the country.

27   50.   CLI leases trucks to citizens of California as well as other states.

28   51.   Upon information and belief, Defendants each grossed more than

9.

1   $500,000 in each of the last six calendar years, individually and collectively.

2       52.    Defendants are enterprises engaged in interstate commerce for

3   purposes of the Fair Labor Standards Act.

4       53.    Defendants have common control and a common business purpose and

5   are operated as a single enterprise, within the meaning of 29 U.S.C. 203(r)(1).

6       54.    All actions and omissions described in this complaint were made by

7   Defendants directly or through their supervisory employees and agents.

8                                    **FACTS**

9   **Misrepresentation That Plaintiffs Would Earn 15 to 43% More As**

10  **Owner Operators.**

11      55.    Through emails, Qualcomm messages, and through CRS's website,

12  Defendants repeatedly represent to their "company driver" employees that they will

13  earn much more as "owner operators" than they do as company drivers. Defendants

14  regularly represent that owner operators will earn $15,000 more than company

15  drivers. Defendants' website states that "Upon becoming a lease operator, the

16  driver's average income will increase by nearly $15,000 per year." The website also

17  states that "Company drivers average between $35,000 to $40,000 in their first year

18  of employment with Central Refrigerated." Thus, the website promise of $15,000

19  more in increased earnings for owner operators is equivalent to 37 to 43% more in

20  pay.

21      56.    Upon information and belief, the vast majority of Owner Operators do

22  not earn 15 to 43 percent more than company drivers (employees). Upon

23  information and belief, nor do average earnings for owner operators amount to 15

24  to 43 percent more than earnings of company drivers. Upon information and belief,

25  Defendants possess all financial data necessary to know that its representations

26  concerning increased earnings are false.

27  **The Contract and Lease Generally**

28      57.    CRS and CLI presented  Plaintiffs  with an integrated series of

                                        10.

preprinted forms, including the Equipment Lease Agreement ("Lease") and Contractor Agreement ("Contract"), referred to collectively as "Agreements," to lease Plaintiffs trucks owned by Defendants, and purporting to make Plaintiffs independent "owner-operator" "business partners" of CRS.

58.  Plaintiffs who sign a Lease with CLI are required to simultaneously sign a Contract with CRS. The CLI Lease and CRS Contract are part of a package that truckers are required to sign in toto.

59.  CRS and CLI do not permit Plaintiffs to take a copy of the Lease and Contract off the premises to review prior to signing. Plaintiffs are made to sign the Lease and Contract "then and there" on Defendants' premises.

60.  In many cases, Plaintiffs are made to review the Agreements at locations far from their home, with no practical way home, other than by signing the Agreements in order to lease the truck as a means of transportation.

61.  The Lease portion of the form Agreement binds Plaintiffs for a term generally ranging from one to three years. The Leases require Plaintiffs to make weekly repayment of a portion of the total Lease term. For example, $500 per week or more was deducted from each named Plaintiff's wages for the lease of the Defendants' truck.

62.  The Contract portion of the form Agreement is for one year, automatically renewable thereafter.

63.  Under the Contract, CRS pays Plaintiffs by mileage rates.

64.  Defendants forbid Plaintiffs to drive their leased trucks for any other trucking companies, yet Defendants do not guarantee any amount of work to Plaintiffs.

65.  The Contracts permit unilateral modifications by Defendants, upon notice to Plaintiffs.

66.  Defendants sometimes demand that Plaintiffs accept Defendants' unilateral Contract modifications during the term of their Contracts. Defendants are

1   able to obtain Plaintiffs' consent to these changes because otherwise Defendants
2   have the ability to terminate Plaintiffs, effectively causing Plaintiffs to be labeled as
3   in default on their Leases.

4       67.   If a driver is "in default" Defendants seize the driver's truck and hold
5   him or her liable for all remaining Lease payments, and make negative entries on
6   Plaintiffs' DAC reports. Defendants are also able to obtain Plaintiffs' consent to
7   contract modifications because Defendants can refuse to dispatch Plaintiffs to new
8   jobs until they agree to the modifications or because Defendants can place Plaintiffs
9   on "safety holds" that prevent them from working until they agree to the
10  modifications.

11      68.   These Contract changes are invariably in favor of Defendants at
12  Plaintiffs' expense.

13      69.   The Lease and Contract are unlawful and unconscionable, insofar as
14  they purport to allow Defendants to (a) employ Plaintiffs but treat them as
15  independent contractors; (b) terminate the Plaintiffs' Lease and  Contract and
16  repossess the truck  but nevertheless require Plaintiffs to continue to make Lease
17  payments; (c) coerce Plaintiffs to remain as employees under threat of serious
18  harm; (d) shift Defendants' costs and risks of doing business to Plaintiffs; (e) make
19  Plaintiffs responsible for the costs of carrying and maintaining Defendants' fleet
20  and equipment; and (f) exact profits and reimbursements from their employees.

21  **Defendants' Control of Plaintiffs/Plaintiffs as Employees of Defendants**

22      70.   Plaintiffs fulfill the primary business in which CRS engages – the
23  transportation of goods.

24      71.   While the Contracts state that Plaintiffs are independent contractors,
25  these contracts allow Defendants to exert nearly complete control over Plaintiffs'
26  work and explicitly state that Plaintiffs cannot work for other companies during the
27  term of the Contract.

28      72.   Defendants CRS's contract states, "The parties acknowledge that

CONTRACTOR will be operating under the operating authority grant to COMPANY by the Federal Motor COMPANY [sic] Safety Administration ("FMCSA"). As required by the DOT Leasing Regulations, the Equipment shall be for COMPANY's exclusive possession, control and use for the duration of the Agreement, and COMPANY shall assume complete responsibility for the operation of the Equipment during such time. ... While CONTRACTOR is operating under COMPANY's operating authority, CONTRACTOR may not haul goods for any third party and while operating the Equipment ... CONTRACTOR agrees not to exceed a driving speed of sixty-five (65) miles per hour or any applicable lower speed limit."

73.     Defendants control Plaintiffs' work to the extent that they are, by law, employees of Defendants.

74.     Defendants dispatch Plaintiffs to jobs that it wishes them to perform. Defendants control the amount of miles driven per week and the amount of money Plaintiffs can earn as a driver.

75.     Defendants monitor and control the time of Plaintiffs' departure and the time of arrival. Defendants can monitor and dictate the route Plaintiffs will travel. Defendants give job instructions through the Qualcomm on-board computer/GPS system, and by telephone. Defendants monitor Plaintiffs' exact location, speed, route compliance, ETA, rest time and driving time and other aspects of job performance through the Qualcomm device. Defendants also affix a "speed governor" to the truck which regulates engine RPM so that a driver may not exceed the company's speed limits, even when state or federal law permits a higher speed. Defendants can seize the truck if Plaintiff does not deliver a load correctly or on time.

76.     CLS does not allow truckers who lease its equipment to drive for any motor carrier other than CRS, despite Lease provisions to the contrary, thereby ensuring their exclusive control over Plaintiffs work.

77.    Defendants prohibit Plaintiffs from freely using the trucks they lease from Defendants by a variety of means, including but not limited to the Contract explicitly stating that CRS shall have exclusive control over the equipment during the term of the Contract.

78.    Thus, while the Contract purports to permit Plaintiffs to be independent contractors, Plaintiffs are compelled to work only for CRS during the terms of their contracts, doing the primary work that CRS performs in the market – trucking of goods for CRS's customers.

79.    Plaintiffs are not "in business for themselves" to any extent greater than a regular employee of CRS, except insofar as they take on CRS's business expenses and pay CRS's employer share of social security taxes.

80.    As set forth above, CRS determines how much work will be allocated to each driver. When Plaintiffs cannot obtain enough work to earn enough to make their truck payments and/or earn a living wage, CRS, at times, will provide loans to drivers with interest, and with an increase in the performance bond maintained by CRS. By giving loans, CRS keeps Plaintiffs owing even more money each month and the money to repay the principal, repay the interest, and to increase the performance bond, is deducted from wages. Exactly like a company store, this constant debt to CRS enhances its control over Plaintiffs, as drivers must earn more money to repay the various debts that they owe to CRS, make truck payments, and avoid default of the CLI Lease. Thus, these loans further enhance Defendants' control over Plaintiffs.

81.    Defendants' misclassification of Plaintiffs as independent contractors caused them loss of wages, additional tax burdens, insurance obligations and a variety of other monetary and non-monetary compensable harm.

**The Shifting of Business Expenses/Minimum Wage Violations**

82.    By the Agreements, Defendants force Plaintiffs to bear Defendants' business expenses. Defendants require Plaintiffs to pay for the truck being used for

14.

Defendants' business purpose, the Qualcomm device by which Defendants send instructions to Plaintiffs, monthly Qualcomm administrative fees, liability insurance, (indemnifying CRS and CLI), taxes, tolls, equipment, gas, truck maintenance, and a variety of other charges, including those designed solely to cover Defendants' administrative expenses and Defendants' profit. Defendants claim the right to claim depreciation on the leased trucks on their tax returns.

83.   Defendants (or agents arranged by Defendants) handle the administration of taxes, licensure, registration, bonding, insurance, tolls, gas, and accounting related to Plaintiffs' trucks, for Defendants' own protection, but pass along all these costs (generally with a markup for profit) to the Plaintiffs.

84.   Plaintiffs are required to pay money to Defendants for a performance bond. Under the Contract, Defendants are authorized to deduct from the bond the various expenses that they have shifted to Plaintiffs in the event that Plaintiffs do not pay them, including for vehicle licenses, insurance, loss or damage to cargo, personal injury or property damage, parts or service, administrative costs, taxes, failure to properly or timely deliver freight, Qualcomm leasing, loss or damage to CRS-owned trucks, and fines or penalties.

85.   Defendants' scheme as described herein shifts virtually all of the costs of maintaining CRS's fleet and general business operations to Plaintiffs, but keeps all the benefits. This scheme also shifts the risk of a downturn in the trucking business from Defendants to Plaintiffs, since Defendants are not obligated to give Plaintiffs any specific amount of work.

86.   CRS fails to pay the wages required by law free and clear to the Plaintiff employees.

87.   Instead, CRS calculates the pay for Plaintiffs by a weekly accounting that makes deductions from the mileage pay due to Plaintiffs for the various business expenses it and CLI shifts to Plaintiffs. Additionally, Plaintiffs are made to bear Defendants' business expenses out of their own pockets. Such expenses

1   constitute de facto deductions from Plaintiffs' pay.

2       88.    In many weeks, the deductions from Plaintiffs' pay yield wages below

3   federal minimum wage guarantees. Thus, Defendants failed to pay Plaintiff the

4   minimum wage for each hour worked.

5   **Termination of the Contract as Default Under the Lease/Forced Labor**

6       89.    The Contracts allow CRS to terminate Plaintiffs' Contracts, with or

7   without cause, on 10 days' notice.

8       90.    Upon information and belief, CRS terminates Drivers' contracts

9   regularly without 10 days' notice.

10      91.    The CLI Leases allows CLI to treat CRS's termination of Plaintiffs as

11  a "default" by Plaintiffs.

12      92.    If a Plaintiff is put in default by CRS, Defendants take possession of

13  the truck, thereby depriving Plaintiffs of their means of livelihood, and claim

14  "liquidated damages" under a provision that guarantees all remaining Lease

15  payments (which can be a hundred thousand dollars or more), including anticipated

16  profits to CRS. This is so even though Defendants' own unilateral conduct

17  terminating the contract may have caused the "default." The Lease allows for

18  liquidated damages despite the fact that any actual losses to CLI are capable of

19  determination and mitigation through re-leasing the truck, and that any losses are

20  far less than what Defendants unreasonably claim from their truckers. Even more

21  onerous to the Plaintiffs is that the Lease provides for acceleration of these lease

22  payments.

23      93.    Furthermore, if Defendants characterize a Plaintiff as in "default" for

24  any reason, Defendants report Plaintiffs' amounts due to credit reporting agencies

25  (thereby impeding Plaintiffs' ability to work for other carriers) and report Plaintiffs'

26  "default" to DAC (thus seriously impeding or denying their ability to obtain future

27  employment).

28      94.    Although the Agreements allow for Plaintiffs to terminate these

16.

1   contracts, Plaintiffs are not free to do so, because terminating a Contract is also

2   termed a "default" in the Lease, leading to the same severe financial and

3   reputational consequences for Plaintiffs as if Defendants has terminated the

4   Contracts.

5       95.    The ability to terminate the Contractor Agreement is not mutual,

6   because there are severe adverse consequences to a Plaintiff regardless of which

7   party terminates it, including repossession of the truck and the trucker's liability to

8   Defendants for liquidated damages, negative DAC reporting, and Defendants'

9   ability to exact profit from characterizing the Driver as in "default."

10       96.    Additionally, the Agreements provide Defendants remedies to collect

11   money owed for breach or termination but do not provide these same remedies to

12   Plaintiffs, who might be owed wages upon termination. For example, Defendants

13   are able to engage in self-help repossession of the leased trucks, take funds from

14   Plaintiffs' maintenance and escrow accounts, make negative entries in Plaintiffs'

15   DAC reports or credit reports, among other remedies.

16       97.    In effect, the Lease (along with Defendants' ability to require Plaintiffs

17   to drive only for Defendants) provides Defendants with the means to pressure and

18   coerce Plaintiffs into allowing Defendants to maintain exclusive control over their

19   work for a period of years and to impose whatever conditions they wish, because

20   Plaintiffs fear being terminated and then becoming subject to the "default"

21   provision in the lease and its myriad negative consequences.

22       98.    If Plaintiffs are terminated or choose to terminate their contract,

23   Plaintiffs are deemed to have defaulted on the lease, allowing Defendants to reap

24   windfall profits, take the truck, report them to credit agencies and HireRight, and

25   prevent them from obtaining future employment in their chosen profession.

26       99.    Defendants' scheme is designed to force the continued labor of

27   Plaintiffs by using threats of serious financial harm through explicit threats to

28   impose, enforce, and collect significant debts of up to a hundred thousand dollars or

1    more on plaintiffs, prohibit Plaintiffs from pursuing their profession by submitting

2    negative entries on their DAC trucker employment report (so that other trucking

3    companies will not hire them), and to report the "default" to credit bureaus so the

4    Driver's credit is destroyed and he or she will not be able to become an owner

5    operator with another trucking company.

6              **Individual Plaintiff Facts**

7         100.   Plaintiff CILLUFFO began working for CRS as an employee, or

8    company driver, in or about July 2010.

9         101.   While he was a company driver, CRS repeatedly promised CILLUFFO

10   and other employees that he (and they) could make nearly $15,000 more as a

11   company driver, or 15-30 percent more money as an owner operator. Plaintiff

12   CILLUFFO was told repeatedly that he would get more miles, that he would be

13   given priority in the assignment of miles, and would make more money as an owner

14   operator.

15        102.   Plaintiff CILLUFFO relied on Defendant's postings on the website and

16   on bulletin boards about the additional income he could earn as an owner operator.

17        103.   In reliance upon the CRS promises, CILLUFFO signed Defendants'

18   form agreements to become an owner operator in March 2011.

19        104.   Plaintiff CILLUFFO began his Lease with CLI in March of 2011.

20        105.   Plaintiff CILLUFFO did not make $15,000 more during his work as an

21   owner operator.

22        106.   Plaintiff CILLUFFO did not make 37.5 to 43 percent more as an

23   owner operator.

24        107.   Plaintiff CILLUFFO did not make 15-30 percent more as an owner

25   operator.

26        108.   In some weeks of work, Plaintiff CILLUFFO did not make any

27   earnings at all, and in fact, was treated by the Defendants as owing them money for

28   the work he performed for their benefit.

109.   On or about June 14, 2011 Defendants terminated CILLUFFO's contract for allegedly being late with a load, which they claimed was a "service failure" despite the fact that CILLUFFO had notified the company via the QualCom device 17 hours in advance that he needed to be rescheduled or for them to arrange for the load to be taken by another driver.

110.   On June 22, 2011 Plaintiff CILLUFFO received a letter from CLI stating that he had "chosen to terminate his Contractor Agreement with Central Refrigerated Service, Inc., as of 2011-06-14 00:00:00, which in turn has left you in default of your lease." This letter also stated:

"Your decisions to terminate the contractor agreement and default on your lease will affect you in the following ways:

-The remaining balance on your lease will be reported to a credit agency showing as a default on your personal credit report.

-You will remain responsible for any applicable lease payments, damage to the tractor (other than normal wear and tear), insurance premiums, or other deductions until the truck is re-seated and/or released to another contractor...

-Central Refrigerated Service, Inc. has a policy to report all drivers' records to DAC reporting agency. You will have a "lease default" on your record along with any other applicable information regarding your performance as a contractor with Central..."

111.   Plaintiff CILLUFFO also received a Lease Default memo from CFI dated 6/14, 2011 that is "authorization to report the following Lessee(s) to the Credit Bureau for default of Lease #18807." This memo showed the Lease default balance to be $87,169.00.

112.   Plaintiff SHIRE began working for CRS as an employee in or about January 2009. He worked as an employee for approximately three months. CRS repeatedly promised SHIRE and other employees that he (and they) could make 15-30 percent more money as an owner operator. In reliance upon the CRS promises,

SHIRE signed Defendants' form agreements to become an owner operator in April 2009.

113.   Plaintiff SHIRE began his Lease with CLI in April of 2009 and worked as an owner operator until approximately January of 2010.

114.   During many weeks of work, Plaintiff SHIRE had no earnings at all, and owed the company more money for expenses than he had earned.

115.   Plaintiff SHIRE worked for Defendants on a "dedicated route." As an owner operator driving a dedicated route, Plaintiff SHIRE was unable to refuse a load offered by the company. If he did so, he would lose his dedicated route.

116.   In or about January of 2010 Defendant CRS terminated SHIRE from employment.

117.   At the time of his termination, Defendants claimed that SHIRE was due no money in earnings and that he owed them money.

118.   Upon terminating SHIRE's services, Defendants demanded and took possession of the leased truck, refused to release it to another driver, took approximately $2,000 in SHIRE's maintenance account, for debts they alleged to be due, kept approximately $1,500 due him in unpaid mileage payments, again claiming Shire owed this amount, and began billing him for approximately $1,500 they claimed was due. Defendants referred this amount to a collections agency which began dunning Mr. Shire. Defendants reported this amount to credit reporting agencies as an unpaid debt due to them. In addition, Defendants made negative entries in Plaintiffs' DAC reports in order to prevent him from finding work with another trucking company. The negative DAC report kept Plaintiff from finding other work as a driver.

119.   Because Defendants had treated SHIRE as an independent contractor, he was unable to claim workers' compensation benefits to cover the period of time he was unable to work.

120.   Plaintiff RATTERREE began working for CRS as an employee in

September of 2010. CRS repeatedly promised RATTERREE and other employees that he (and they) could make 15-30 percent more money as an owner operator. Defendant CRS sent Plaintiff RATTERREE many messages through his Qualcomm device when he completed loads stating how much he would have made on that load if he was an owner operator. He also was given a document by Defendant called "Pay Package Comparison" that showed an annualized income of $34,172.32 for company drivers driving 2800 miles a week compared with owner operators earning $49,817 for the same number of miles driven in a week, a 30% increase in income. As he was engaged to be married and wanted to help his fiancé thru college, RATTERREE believed CRS's representations and thought becoming an owner operator under the terms promised by Defendants was a good financial plan. In reliance upon the CRS promises, RATTERREE signed Defendants' form agreements to become an owner operator in November 18, 2010.

121.   Plaintiff RATTERREE did not make $15,000 more, nor 15 to 30% more as an owner operator. Plaintiff RATTERREE made less money as an owner operator.

122.   During many weeks of work for Defendants, Plaintiff RATTERREE earned no money at all and was treated as owing Defendants for the work he performed on their behalf. Over the entire period that he was an owner operator, RATTERREE had negative income – i.e. he owed more money than he received.

123.   When Plaintiff RATTERREE told Defendants that he no longer wanted to be in his truck because of the number of weeks with negative pay settlements, he was threatened by Defendants that CRS would place negative marks on his DAC and credit report, and that he would suffer legal penalties from Defendants needing to repossess the truck, fix any damages, or do any basic upkeep needs that the truck required at the time it was returned to the terminal.

124.   On or about December 27, 2010, while RATTERREE was in the terminal in Salt Lake City, Defendant unilaterally repossessed RATTERREE's

21.

truck. Defendant had security guards surround RATTERREE and tell him that his driver manager "would be accepting his resignation." Defendant then demanded his truck and disabled it so it could not be driven.

125. Thereafter, Plaintiff RATTERREE was dunned by Partner's Financial Services Inc. on behalf of Defendant for $844.02, $2661.76, and $1339.45, totaling $4,845.22 for amounts that Defendants claimed he owed.

126. As an employee company driver, Plaintiff RATTERREE received gross wages of $5934.25 for about two and a half months work (an approximate weekly average of $540). When his work was characterized as an independent contractor Owner Operator, his weekly settlements were: ($3.43), [amount unknown], $220, ($849), ($1142), ($1044), ($3545) [amounts in parentheses are negative numbers].

**Defendants' Actions Were Willful and Defendants' Unlawful Practices Were Widespread**

127. Defendants' failure to pay Plaintiffs the proper wages required by law was willful.

128. Defendants' unlawful conduct, as set forth in this Class Action Complaint, has been intentional, willful, and in bad faith, and has caused significant damages to Plaintiffs and the Class.

129. Defendants were aware or should have been aware that the law required them to pay Plaintiffs and the Plaintiff Class members minimum wages for each workweek.

130. Upon information and belief, Defendants apply the same unlawful policies and practices to the Plaintiffs in every state in which they operate.

**FIRST CAUSE OF ACTION**

**(FAIR LABOR STANDARDS ACT)**

131. Plaintiffs re-allege and incorporate by reference all allegations in all

preceding paragraphs

132.   Defendants failed to pay minimum wages to Plaintiffs in violation of the Fair Labor Standards Act, 29 U.S.C. §206 et seq. and its implementing regulations.

133.   Defendants' failure to pay proper minimum wages for each hour worked per week was willful within the meaning of the FLSA.

134.   Defendants' failure to comply with the FLSA minimum wage protections caused Plaintiffs to suffer loss of wages and interest thereon.

## SECOND CAUSE OF ACTION
## (FORCED LABOR)

135.   Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

136.   Defendants obtained the continuous labor of Plaintiffs by using threats of serious harm.

137.   Defendants operated a scheme, plan or pattern intended to cause Plaintiffs to believe that non-performance of labor would result in serious harm.

138.   Defendants threatened Plaintiffs that they would use the legal system, debt collection system, and DAC Reports to enforce the crushing debt that defendants' Lease and Contract operation imposed on Plaintiffs.

139.   Defendants' scheme, plan or pattern caused Plaintiffs to engage in forced labor for Defendants in violation of the federal forced labor statutes, 18 U.S.C. §§ 1589 and 1595.

/

//

/

/

WHEREFORE, Plaintiffs request that this Court enter an Order:

1.  With respect to the FLSA violations

    a.  Declaring that Defendants violated the FLSA;

    b.  Approving this action as a collective action and directing that Notice be issued to all Class Members;

    c.  Declaring that Defendants' violations of the FLSA were willful;

    d.  Granting judgment to Plaintiffs and represented parties for their claims of unpaid wages as secured by the Fair Labor Standards Act, as well as an equal amount in liquidated damages and interest; and

    e.  Awarding Plaintiffs and represented parties their reasonable attorneys' fees and costs of suit including expert fees and interest.

2.  With respect to the Forced Labor Claim:

    a.  Certifying this action as a class action;

    b.  Designating Plaintiffs as Class Representatives;

    c.  Designating the undersigned counsel as Class Counsel;

    d.  Entering a declaratory judgment that the practices complained of herein are unlawful;

    e.  Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not necessarily limited to an order determining that the contract is void, or voidable, or alternatively severing any unconscionable clauses and enjoining Defendants from continuing their unlawful practices as described herein;

    f.  Awarding statutory, compensatory and punitive damages, liquidated damages, appropriate statutory penalties, and restitution to be paid by Defendants according to proof;

24.

g.   Awarding Pre-judgment and Post-Judgment interest, as provided by law;

h.   Granting such other legal and equitable relief as the Court may deem just and proper; and

i.   Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

Dated: June 1, 2012

Respectfully Submitted,

Schonbrun DeSimone Seplow
Harris Hoffman & Harrison LLP

Getman & Sweeney, PLLC

Martin & Bonnett, PLLC

Edward Tuddenham

BY: _____
Benjamin Schonbrun
ATTORNEY FOR PLAINTIFFS

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Virginia A. Phillips and the assigned discovery Magistrate Judge is Oswald Parada.

The case number on all documents filed with the Court should read as follows:

### EDCV12- 886 VAP (OPx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [X] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐) | **DEFENDANTS** |
|---|---|
| Gabriel Cilluffo <br> Kevin Shire <br> Bryan Ratterree | Central Refrigerated Services, Inc. <br> Central Leasing, Inc. <br> Jon Isaacson and Jerry Moyes |

| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br><br> Benjamin Schonbrun <br> Schonbrun DeSimone Seplow Harris Hoffman & Harrison LLP <br> 723 Ocean Front Walk, Venice, CA 90291 (310)396-0731 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No  ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Seeks redress under the F.L.S.A. 29 U.S.C. §201, et seq. for defendants failure to pay Plaintiffs minimum wages throught misclassification of plaintiffs.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☒ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

ED CV 12 - 00886 VAP (OPx)

**FOR OFFICE USE ONLY:** Case Number: _____  JUN - 1 2012

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A.   Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.   Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.   For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.   Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
   ☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County | Placer County, CA <br> Spokane County, WA |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
   ☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Santa Clara County, CA |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

\* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.   SIGNATURE OF ATTORNEY (OR PRO PER): _[signature]_     Date   6-1-2012

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |