**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**



FILED
CLERK, U.S. DISTRICT COURT

NOV 9, 2017

CENTRAL DISTRICT OF CALIFORNIA
BY:     BH     DEPUTY

Gabriel Cilluffo et al.,

                 Plaintiff,

       v.

Central Refrigerated Services, Inc. et
   al.,

                Defendant.

ED 12-cv-00886 VAP (OPx)

**Order Granting Motion for**
**Preliminary Settlement Approval**
**(Doc. No. 227)**

On August 21, 2017, Named Plaintiffs Gabriel Cilluffo, Kevin Shire, and Bryan Ratterree (collectively "Plaintiffs") filed a motion for preliminary approval of a Settlement Agreement. (Doc. No. 227.) Having considered the papers filed in support of the Motion, the Court GRANTS the Motion.

# I. BACKGROUND

## A. The Action

The Named Plaintiffs Gabriel Cilluffo, Kevin Shire, and Bryan Ratterree (collectively "Plaintiffs" or "Named Plaintiffs") are long-haul truck drivers who leased trucks from Defendant Central Leasing, Inc. in order to haul freight for Defendant Central Refrigerated Service, Inc.'s customers. On June 1, 2012, the Named Plaintiffs filed a Collective & Class Action Complaint ("Complaint") against Defendants Central Refrigerated Service, Inc.; Central Leasing, Inc.; Jerry Moyes;

United States District Court
Central District of California

and Jon Issacson (collectively, "Defendants") in the above-captioned case pending in this Court ("Action").  (Doc. No. 1)

Plaintiffs alleged in their Complaint that the Defendants are liable for the misclassification of the Plaintiffs and other lease operator drivers as independent contractors and failing to pay them the legally required minimum wage for each hour worked per week in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206 *et seq.*  The Plaintiffs also alleged that the Defendants violated the federal forced labor statutes, 18 U.S.C. §§ 1589, 1595.

On September 24, 2012, the Court stayed the Action, and granted Defendants' motion to compel arbitration pursuant to the UUAA.  (Doc. No. 53.)  On November 8, 2012, the Court held that the FLSA claim could proceed on a collective basis, but arbitration of Plaintiffs' forced labor claims must occur individually.  (Doc. No. 61 at 4.)

**B.   The Collective Action**

The Collective Action consists of a conditionally-certified collective of approximately 1,350 plaintiffs who opted-in to the FLSA collective arbitration between the parties pending before the American Arbitration Association ("AAA") Case No. 77 160 00126 13 PLT.  (Doc. No. 228-2 at ¶¶15-19.)  This Collective Action consists of "truckers who leased a truck from Central Leasing, Inc. to drive for Central Refrigerated Service, Inc. on or after June 1, 2009."  (Id. at ¶17.)  The Arbitrator Patrick Irvine (the "Arbitrator") denied Defendants' Motion to Decertify the Conditionally-Certified Class on October 26, 2016, dismissed 26 members, and ruled that approximately 1,350 plaintiffs were employees under the FLSA and that

United States District Court
Central District of California

Defendants had misclassified these plaintiffs as independent contractors.  (Id. at ¶¶20-21.)  The parties entered into a Memorandum of Understanding to begin settlement negotiations at the end of April, 2017 – just before an arbitration trial was scheduled to begin in the Collective Action in early May 2017.  (Id. at ¶¶22, 35.)

### C.  The Individual Arbitrations

The "Individual Arbitrations" refers to the approximately 328 individual drivers ("Individual Plaintiffs") who have submitted demands to the AAA for individual arbitration against Defendants.  (Doc. No. 228-2 at ¶¶23.)  The Individual Plaintiffs asserted claims for: "federal common law fraud," Utah common law fraud and negligent misrepresentation, "unconscionability," Utah common law unjust enrichment, as well as claims for violation of federal forced labor statutes and "state wage and hour law" (i.e., they alleged violations of state minimum wage and unlawful deduction statutes).  (Id. at ¶24.)  Twenty nine arbitrators were assigned to hear the claims of the first 300 individual arbitrations.  (Id. at ¶¶25.)  In July 2016, the parties agreed to fast-track eight "bellwether" arbitrations in front of four arbitrators.  (Id. at ¶¶26.)  In March 2017, the parties filed motions for summary judgment in all bellwether cases.  (Id. at ¶¶27.)  Four-day arbitration trials for each of the bellwether cases were scheduled to start in July 2017.  (Id. at ¶¶28.)

### D.  Settlement Agreement

This Settlement Agreement provides for the settlement of the pending claims against Defendants in Cilluffo, et al. v. Central Refrigerated Service, Inc., et al., Case No. 12-00886-VAP (OPx), as well as the Collective Action and Individual Arbitrations pending before the American Arbitration Association ("AAA").  It is attached as Exhibit 1 to Plaintiffs' Memorandum of Points and Authorities In

Support of Unopposed Motion for Preliminary Settlement Approval. ("Settlement Agreement"). Key provisions of the Settlement Agreement are outlined below.

### 1.    Monetary Relief to Claimants

The Settlement Agreement provides for a Gross Settlement Amount of no more than certain lump sum. (Settlement Agreement at ¶ 2.3(A)(i).) The Gross Settlement Amount will be divided between two non-reversionary funds, Fund A and Fund B. (Settlement Agreement at ¶ 2.3(A)(ii) and (iii).)

### a.    Fund A

Fund A Claimants consist of drivers who joined the Collective Action or filed an Individual Arbitration. (See Settlement Agreement at ¶2.1 (N); id. at Exh. E.) The parties estimate that there are approximately 1,356 Fund A Claimants. (Settlement Agreement at ¶2.3(A)(ii).) Fund A Claimants will be able to opt out of the settlement if they do not wish to participate.

82.5% of the total settlement amount – less the proportionate share of approved attorneys' fees and costs, administrative costs and service awards – will be allocated pro rata to Fund A Claimants who do not timely opt out of the settlement. (Settlement Agreement at ¶2.3(A)(ii); Settlement Agreement at ¶ 2.3(B)(i).) Each claimant will receive a payment based on a formula that takes the total number of hours worked multiplied by a damage recovery per hour which is variable based on their average hourly earnings. This formula is "based on Plaintiffs' counsel's privileged assessment of the Fair Settlement Value of claims in relation to the average hourly wages paid by Defendants." (Settlement Agreement at Exh. F.)

Each Fund A Claimant will received a minimum award.  (Id.)  All Fund A Claimants who filed individual arbitration claims will receive an additional award.  (Id.)

### b.    Fund B

Fund B claimants consist of drivers who were eligible to and did not previously join the Collective Action or file an Individual Arbitration, but who timely opt in to the settlement.  The parties estimate that there are approximately 1,955 potential Fund B Claimants.  (Settlement Agreement at Exh. G.)

About 17.5% of the total settlement amount, less the proportionate share of approved attorneys' fees and costs, administrative costs and service awards, will be allocated to participating Fund B Claimants who timely opt in to the settlement, on a pro rata basis based on the number of months each participating Fund B Claimant worked for Central Refrigerated from June 1, 2009 to the date of the Settlement Agreement.  (Settlement Agreement at ¶ 2.3(B)(ii).)

Each participating Fund B claimant will receive a minimum payment.  (Settlement Agreement at ¶2.3(B)(ii).)

### 2.    Cy Pres Recipient

The unclaimed funds remaining in Fund A after one year after distribution from Fund A commences, shall be paid to a cy pres recipient.  Since the parties could not come to an agreement on a cy pres recipient, they have provided their respective recommendations to the Court for selection.  (Settlement Agreement at ¶¶ 2.3(B)(i), 2.5(A), and 2.6(B)(i).)

### 3.    Additional Benefits Offered to Claimants

Defendants have agreed not to pursue collection efforts against participating settlement members with respect to leases involving Central Leasing or in connection with Central Refrigerated's contracts.  (Settlement Agreement at ¶ 2.8(D).  Central Refrigerated and Central Leasing will also release and dismiss with prejudice any counterclaims they have filed, or ever could file, based on any occurrences that took place prior to May 5, 2017.  (Id.)  Upon request, Defendants Central Refrigerated and Central Leasing will timely provide a letter to a background screening company on behalf of a Participating Settlement Member that defaults under the Central Leasing lease have been rescinded. (Settlement Agreement at ¶ 2.8(I).)

### 4.    Release of Claims Against Defendants

The Named Plaintiffs have agreed to release any and all claims against Defendants and all other Released Parties.  (Settlement Agreement at ¶ 2.8(F).) Other participating Settlement Members release all claims against Defendants and other Released Parties that related to the services they provided at issue in the Action.  (Settlement Agreement at ¶ 2.8(A).)  The Settlement Agreement does not affect the claims by potential Fund A claimants who opt-out of the settlement, or potential Fund B claimants who do not affirmatively opt-in.  (Settlement Agreement at ¶¶ 2.9(C), 2.10 (C).

### 5.    Attorney's Fees and Costs

When moving for final approval of the settlement, Plaintiffs' counsel will request attorney's fees in an amount not to exceed 33% of the Gross Settlement

Amount and certain costs.  (Settlement Agreement at ¶ 2.3(F).)  Attorney's fees and costs are to be proportionally deducted from Fund A and Fund B.

### 6.   Incentive Awards

Plaintiffs seek approval of "service awards" are not more than 3% of the Gross Settlement Amount, to be deducted proportionally from Fund A and Fund B. (Settlement Agreement at ¶ 2.3(G).)  Named plaintiffs receive the highest incentive award, plaintiffs who sat for a deposition in the Collective Action receive a lesser amount, and a plaintiff who sat for a deposition in the Individual Arbitrations receives the smallest incentive award.  (Id.)

### 7.   Notice

The parties have selected Settlement Services, Inc. as the settlement administrator and will mail notices to the Settlement Class members by email and first class mail once approved by the Court.  (Settlement Agreement at ¶¶ 2.5(A), 2.9(A), 2.10(A), 2.12(A).)

## II.   LEGAL STANDARD

At the preliminary approval stage, the Court need only consider whether the proposed settlement "(1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval."  Harris v. Vector Mktg. Corp., No. C-08-5198 EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011); see also Moppin v. Los Robles Reg'l Med. Ctr., No. EDCV15-1551 JGB (DTBx), 2016 WL 7479380, at

United States District Court
Central District of California

*8 (C.D. Cal. Sept. 12, 2016) ("At the Preliminary Approval phase, the Court need only decide whether the settlement is *potentially* fair.") (emphasis in original.)

"The Court is not bound to exercise the same oversight of a settlement of a FLSA collective action as it must exercise with a class action under Federal Rule of Civil Procedure 23(e)." Villalobos v. Calandri, No. CV12-2615 PSG ( JEMx), 2016 WL 6901695, at *4 (C.D. Cal. Mar. 14, 2016); Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 607 (E.D. Cal. 2015) ("[A] Court has a 'considerably less stringent' obligation to ensure fairness of the settlement in a FLSA collective action than a Rule 23 action because parties who do not opt in are not bound by the settlement."). Yet courts in the Ninth Circuit assessing FLSA collective action settlements often look to the same factors used in assessing preliminary certification of class actions under Rule 23 class certification, including "(1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." Id. (citing Torrisi v. Tuscan Electric Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993)). Id.; Goodwin v. Winn Mgmt. Grp. LLC, No. 115CV00606 DAD (EPG), 2017 WL 3173006, at *4 (E.D. Cal. July 26, 2017).

### III.    DISCUSSION

### A. Fairness, Adequacy, and Reasonableness of the Settlement
#### 1. Arms-Length Negotiations

A settlement that is the product of an arms-length negotiation "conducted by capable and experienced counsel" is presumed to be fair and reasonable. <u>Roe v. SFBSC Management, LLC</u>, No. 14-CV-03616-LB, 2017 WL 4073809, at *9 (N.D. Cal. Sept. 14, 2017) (quoting <u>Garner v. State Farm Mut. Auto Ins. Co.</u>, 2010 WL 1687832, *13 (N.D. Cal. Apr. 22, 2010); <u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d 948, 965 (9th Cir. 2009)("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."); <u>Bautista v. Harvest Mgmt. Sub LLC</u>, No. CV12-10004 FMO (CWx), 2013 WL 12125768, at *12 (C.D. Cal. Oct. 16, 2013) ("A settlement reached through the assistance of an experienced mediator supports a determination that the settlement process was not collusive.").

"Starting on June 23, 2016 and occurring simultaneously with litigation, the parties engaged in extensive negotiations; exchanges of data, documents, and information; and mediation with private mediator Hunter Hughes, a well-known experienced mediator in the wage and hour collective and class action field." (Doc. No. 228-2 at ¶ 33; Doc. No. 228-3 at ¶ 6; Doc. No. 228-4 at ¶8.) These efforts culminated in the Settlement Agreement before the Court. (Doc. No. 228-2 at ¶¶34-40, 52.).

"The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." <u>Satchell v. Fed. Express Corp.</u>, No. C 03 2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007); <u>see</u> <u>also</u>, <u>Alexander Mfg., Inc. v. Illinois Union Ins. Co.</u>, 666 F. Supp. 2d 1185, 1202 (D. Or. 2009). The Court

is thus satisfied the Settlement Agreement is the product of a non-collusive, arms-length negotiation."

### 2. Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

Given that the evidence has not been fully presented, the Court does not reach any final conclusions regarding the contested issues of fact and law that underlie the merits of Plaintiffs' case.  <u>Aguilar v. Wawona Frozen Foods</u>, No. 115CV00093 DAD (EPG), 2017 WL 2214936, at *3 (E.D. Cal. May 19, 2017).  Instead, "the court is to 'evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements.'"  <u>Id</u>. (quoting <u>In re Wash. Pub. Power Supply Sys. Sec. Litig.</u>, 720 F. Supp. 1379, 1388 (D. Ariz. 1989).)

Plaintiffs' FLSA Collective Action minimum wage claim appears strong, since they obtained summary judgment on the issue of whether they were misclassified as independent contractors under the FLSA.  (Doc. No. 228 at 17.)  Plaintiffs were also buoyed by the Arbitrator's denial of a motion to decertify the Collective Action just prior to trial.  (Doc. No. 228 at 19.)

The complexity of damages and the large number of plaintiffs meant that significant risks remained for Plaintiffs, however.  The parties' experts differed vastly on key variables underlying any damage award, and it seems possible that the damages would be so individualized they could not be litigated on a collective basis. (Doc. No. 228 at 19.)  Defendants' actions in moving for summary judgment on "the other claims in Plaintiffs' Individual arbitrations" and general position that they

would challenge unfavorable rulings or judgments potentially indicate further weaknesses in Plaintiffs' case.  (Doc. No. 228 at 17-20.)  Setting aside the merits of such challenges, at the very least a lengthy battle over these issues would come at great expense to the parties.  (Doc. No. 228 at 18-20.)  The Court thus concludes that this factor weighs in favor of approving of this settlement.

### 3. The Amount Offered in Settlement

The amount offered in settlement is one of the most important factors to be considered by the Court when contemplating preliminary approval.  Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 611 (E.D. Cal. 2015) ("The amount offered in settlement is generally considered to be the most important consideration of any class settlement.")  In order to determine whether this factor favors approval, the Court must compare the amount offered in settlement to the maximum possible recovery.  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424–25 (1968) ("Basic to this process in every instance [of assessing the merits of compromises between litigants], of course, is the need to compare the terms of the compromise with the likely rewards of litigation.").  Depending on the Court's assessment of the strength of the case, an appropriate fraction of the maximum recovery may be approved.  Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (citation omitted.); Millan, 310 F.R.D. at 611 (illustrating the broad range of settlements for fractions of the estimated maximum recovery that have been approved by district courts); Bautista v. Harvest Mgmt. Sub LLC, No. CV12-10004 FMO (CWx), 2013 WL 12125768, at *14 (C.D. Cal. Oct. 16, 2013) (same).

As discussed above, the Settlement Agreement creates two settlements funds, Fund A and Fund B, which together total of no more than a certain amount.  (Doc. No. 228 at 20.)  The parties have agreed to allocate 82.5% of this amount to Fund A, and 17.5% to Fund B, less the proportionate share of approved attorneys' fees and costs, administrative costs and service awards.  (Doc. No. 228 at 20-21.)

Plaintiffs provide an estimate for the minimum recovery and average recovery that members of Fund A and Fund B should receive if the Settlement Agreement is approved.  (Doc. No. 228 at 20-24.)

The parties have agreed that Fund B payments are to be allocated on a pro rata basis based on the number of months each participating claimant worked from June 1, 2009 to the date of the Settlement Agreement.  (Doc. No. 228 at 21.)[1]

Plaintiff's expert provided an estimate of damages for Fund A claimants prior to trial. (Doc. No. 245-1 at 9.)  The Fund A gross settlement amount represents approximately 54% of the "best day" maximum recovery amount before attorney's fees and service awards are deducted.  (Doc. No. 245-1 at 9-10.)  If the proposed service fees and attorney's fees are deducted, the Fund A settlement represents 34% of Plaintiff's estimate of the maximum recovery.  (Id.)  Plaintiff's expert also provided an alternative damage estimate, which would mean that the gross settlement amount for Fund A would represent approximately 84.6% of Plaintiff's

---

[1] Plaintiffs also outline additional, non-monetary benefits that come with the Settlement Agreements, including Defendants to drop certain collections efforts and to release certain counterclaims.  (Doc. No. 228 at 22.)  Plaintiffs have not provided an estimate for the value of these benefits.

alternative estimate of maximum recovery, and 54% with the deduction of attorney's fees and service awards.  (Doc. No. 245-1 at 9-10.)

Given the uncertainties of trial and difficulties in proving Plaintiffs' case and Plaintiff's estimates of the maximum possible recovery, the Court finds that this settlement represents a fair and adequate recovery for Fund A claimants.  The most conservative estimate of the percentage of the maximum recovery that Fund A represents is 34%.  Even when Plaintiffs' most aggressive estimate of the maximum potential recovery is adopted and the entire amount of the requested attorney's fees and service payments is deducted from the settlement amount, the resulting percentage is still greater than other fractional settlements approved by the Ninth Circuit.  See, e.g., In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000), as amended ( June 19, 2000) (finding that the district court did not err in approving a settlement amount that "was roughly one-sixth of the potential recovery" as estimated by the maximum estimated damages presented to the district court).

Plaintiffs do not provide a maximum recovery amount for potential Fund B claimants, since these potential claimants did not file any claims nor were they the subject of discovery.  However, each Fund B claimant would have the option of declining the settlement amount in the event that they believe it to be inadequate.

The Court finds that this factor weighs in favor of granting preliminary approval.

United States District Court
Central District of California

### 4. The Extent of Discovery Completed, and the Stage of the Proceedings

This factor requires the Court to evaluate whether "the parties have sufficient information to make an informed decision about settlement." Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1239 (9th Cir. 1998). Here, Plaintiffs demonstrate that class counsel conducted the following discovery: (1) hundreds of thousands of pages of documents and dozens of gigabytes of data have been exchanged (Doc. No. 228-2 at ¶30); (2) over two hundred depositions have been conducted (Doc. No. 228-2 at ¶31); and (3) additional exchanges of data, documents and information in connection with the mediation and settlement process (Doc. No. 228-2 at ¶33.) In addition to this information, each party commissioned several experts. (Doc. No. 228-2 at ¶ 32.) The Court thus finds that the parties possessed sufficient information to make an informed decision about the settlement. Accordingly, this factor supports preliminarily approving the settlement.

### 5. Experience and Views of Counsel

Since "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation," courts tend to give considerable weight to counsel's opinion. Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 967 (9th Cir. 2009) (quoting In re Pac. Enters. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995); See, e.g., Alberto v. GMRI, Inc., No. CIV. 07-1895 WBS, 2008 WL 4891201, at *10 (E.D.Cal. Nov.12, 2008) ("When approving class action settlements, the court must give considerable weight to class counsel's opinions due to counsel's familiarity with the litigation and its previous experience with class action lawsuits."); but see, Kempen v. Matheson Tri-Gas, Inc., No. 15-CV-00660-HSG, 2017 WL 3670787, at *6 (N.D. Cal. Aug. 25, 2017) ("[T]he Court affords only modest weight to counsel's views."); Chun-Hoon v. McKee

14

Foods Corp., 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) ("[T]his court is reluctant to put much stock in counsel's pronouncements, as parties to class actions and their counsel often have pecuniary interests in seeing the settlement approved.").  Class counsel and Defendants' counsel appear to have experience in similar types of litigation.  Plaintiffs' counsel believes the Settlement Agreement is in the best interests of all plaintiffs who opt in.  (Doc. No. 228-2 at ¶53; Doc. No. 228-3 at ¶6; Doc. No. 228-4 at ¶9.)  Defendants have executed the Settlement Agreement, and do not oppose Plaintiffs' Motion.  The Court finds that this factor weights in favor of granting preliminary approval to the Settlement Agreement.

### 6.    Reaction of Class Members to the Proposed Settlement

The lack of objections or opt-outs, combined with a high claim rate, weighs strongly in favor of settlement approval.  See, e.g., Barcia v. Contain-a-Way, Inc., No. 07cv938-IEG, 2009 WL 587844, at *4 (S.D.Cal. Mar.6, 2009); Thompson v. Costco Wholesale Corp., No. 14CV02778 CAB (WVG), 2017 WL 3840342, at *7 (S.D. Cal. Sept. 1, 2017).

Despite claiming that "the Reaction of the Class Members to the Proposed Settlement is Highly Favorable," Plaintiffs provide no evidence regarding plaintiffs other than the fact that the named plaintiffs signed the Settlement Agreement.  (Doc. No. 228 at 26.)  Plaintiffs suggest that additional evidence will be forthcoming "after notice issues and Settlement Class members are given the opportunity to opt-out or object." (Doc. No. 228 at 26.)  Therefore, the Court expects to see further evidence before it will grant final approval of the settlement.  The absence of this evidence at this stage neither weighs in favor nor against preliminary approval.

United States District Court
Central District of California

### 7.     Attorney's Fees and Recognition Payment for Named Plaintiffs

#### a.     Attorney's Fees

The FLSA mandates "a reasonable attorney's fee to be paid by the defendant, and the costs of the action" if a judgement is awarded to the plaintiff.  29 U.S.C. § 216(b).  The Court has an "independent obligation to ensure that the [attorney's fees] award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011).  "[T]he district court must assume the role of fiduciary for the class plaintiffs when awarding attorneys' fees from a common fund" since "the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage."  In re Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1302 (9th Cir. 1994).  "At the preliminary approval stage, the Court need not make its final decision regarding the reasonableness of attorneys' fees and costs, but need only determine that the requested fees and costs are not the products of apparent collusion."  Moppin v. Los Robles Reg'l Med. Ctr., No. EDCV15-1551 JGB (DTBx), 2016 WL 7479380, at *10 (C.D. Cal. Sept. 12, 2016).

In cases such as this one, where the attorney's fees are calculated using the "percentage of the fund" method, twenty-five percent (25%) is the benchmark used in the Ninth Circuit.  In re Bluetooth, 654 F.3d at 942; Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002); Powers v. Eichen, 229 F.3d 1249, 1256 (9th Cir. 2000).  Any departure from that percentage requires adequate explanation in the record of the "special circumstances" involved.  In re Bluetooth, 654 F.3d at 942. Certain factors may justify an upward departure from the benchmark percentage. Hightower v. JPMorgan Chase Bank, N.A., No. CV11-1802 PSG (PLAx), 2015 WL 12644569, at *10 (C.D. Cal. Feb. 3, 2015) ("These factors include the quality of the

results achieved; the risks of litigation; whether counsel generated benefits beyond the cash settlement; the skill required and the quality of the work; the contingent nature of the fee; the prevailing market rate compared to awards in similar cases; and the financial burden carried by counsel.")

Here, Plaintiffs have indicated that they will seek attorney's fees in the amount of "33% of the Gross Settlement Amount plus costs and expenses incurred in prosecuting the litigation." (Doc. No. 228 at 14, n.1.) Plaintiff's counsel's explanation for the requested upward departure from the benchmark percentage provided in Plaintiff's supplementary briefing is persuasive. The Court is impressed by the result achieved in this case and the time and resources invested by Plaintiff's counsel. This factor thus weighs in favor of granting preliminary approval. The Court defers ruling on whether the amount sought in attorney's fees sought is reasonable until after Plaintiffs' counsel has submitted copies of the contemporaneous time-keeping records for this case.

### b.   Incentive Payments for Named Plaintiffs

Incentive awards for class representatives must be "scrutinize[d] carefully . . . so that they do not undermine the adequacy of the class representatives." Radcliffe v. Experian Info. Sols. Inc., 715 F.3d 1157, 1163 (9th Cir. 2013) ("[I]n some cases incentive awards may be proper but . . . awarding them should not become routine practice. . . ."). In determining whether and how much to award class representatives in incentive payments, Plaintiffs must demonstrate the representatives' actions in protecting the interests of the class, the degree to which those actions benefitted the class, the amount of time and effort the representatives spent pursuing the litigation, and the representatives' reasonable fear of being

retaliated against for their visible participation.  <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 977 (9th Cir. 2003) (citing <u>Cook v. Niedert</u>, 142 F.3d 1004, 1016 (7th Cir.1998)). Courts also consider the number of representatives being awarded incentive payments, the proportion of the payments to the settlement amount, and the size of each payment.  <u>Staton</u>, 327 F.3d at 977.  "Courts may award different fees to representatives based on their different contributions to the case."  <u>Hightower v. JPMorgan Chase Bank, N.A.</u>, No. CV11-1802 PSG (PLAx), 2015 WL 12644569, at *11 (C.D. Cal. Feb. 3, 2015).

Here, the Plaintiffs seek approval of "service awards" that are not more than 3% of the Gross Settlement Amount), to be deductive proportionally from Fund A and Fund B.  (Doc. No. 228 at 14-15.)  Named plaintiffs receive the highest incentive award, plaintiffs who sat for a deposition in the Collective Action receive a lesser amount, and a plaintiff who sat for a deposition in the Individual Arbitrations receives the smallest incentive award.  (<u>Id.</u>)

The Court finds some of the reasons supporting these awards provided by Plaintiffs' counsel persuasive.  For example, the Court finds it compelling that the incentive awards sought only make up a small percentage of the total settlement amount.  (Doc. No. 251-1 at 22 ("[T]he requested service awards [for named plaintiffs] are collectively 0.375% of the [Gross Settlement Amount].");  <u>id.</u> at 24 ("The service awards for depositions total 2.3% of the [Gross Settlement Amount]. . . .").)  It is also persuasive given Plaintiff's declarations suggesting that participation in this case may harm the employment prospects of certain plaintiffs.  (<u>See</u>, <u>e.g.</u>, Doc. No. 251-6 at ¶¶7-11; Doc. No. 251-7 at ¶¶8-9. Doc. No. 251-8 at ¶9.)  Some of

the reasons offered by Plaintiff's counsel, however, are not persuasive.  In particular, the Court is skeptical of Plaintiff's counsel's claim that Plaintiffs "had to drop their work and family lives on a moment's notice to respond to discovery requests." (Doc. No. 251-1 at 20.)  Surely Counsel is aware that the rules governing such requests require significantly more than a "moment's notice."

The Court is not inclined to grant the incentive awards requested by Plaintiffs, but finds that more than a nominal amount for incentive awards is likely appropriate. As with Plaintiffs' request for Attorney's Fees, the Court declines to make a final determination on the amount to be allocated as incentive awards at this time.  This factor neither weighs in favor nor against preliminary approval.

### 8.    Release of Claims

The Court must examine whether the settlement agreement includes a release of absent class members' claims and whether any such release is overly broad.  <u>See Spann v. J.C. Penney Corp.</u>, 314 F.R.D. 312, 328 (C.D. Cal. 2016) (balancing "fairness to absent class members and recovery for plaintiffs with defendants' business interest in ending this litigation with finality."); <u>Bond. v. Ferguson Enterprises, Inc.</u>, No. 1:09-CV-01662, 2011 WL 284962, at *7 (E.D. Cal. Jan. 25, 2011) (rejecting settlement for containing an overly broad settlement release of class members' claims); <u>Goodwin v. Winn Mgmt. Grp. LLC</u>, No. 1:15-CV-00606 DAD EPG, 2017 WL 3173006, at *11 (E.D. Cal. July 26, 2017) (determining release provision to be appropriate since the claims would only be released who affirmatively opted-in and tracked the claims at issue in the lawsuit.).

United States District Court
Central District of California

The releases in the Settlement Agreement only pertain to those Plaintiffs who have affirmatively opted-in to the settlement.  (Doc. No. 228 at 13-14 (describing the release for the Named Plaintiffs and the release for other plaintiffs who have opted-in the Settlement Agreement).  The Settlement Agreement does not affect the claims by potential Fund A claimants who opt-out of the settlement, or potential Fund B claimants who do not affirmatively opt-in.  (Settlement Agreement at 2.9(C) ("Any Fund A claimant who properly and timely submits a request for exclusion . . . will not be bound by the Settlement Agreement, and will remain free to pursue any claim as to that individual that would have been barred by this Settlement Agreement."); id. at 2.10 (C) ("Any Potential Fund B Claimant who does not properly and timely submit a request to opt in . . . .will not be bound by the Settlement Agreement, and will remain free to pursue any claim as to that individual that could have been barred by this Settlement Agreement . . . .").).  The Court finds that this factor weighs in favor of granting preliminary approval.

### 9.    Cy Pres Award

"[A] *cy pres* remedy must provide the 'next best distribution' absent a direct monetary payment to absent class members," not necessarily the recipient that the court or class members would find ideal.  Lane v. Facebook, Inc., 696 F.3d 811, 820-21 (9th Cir. 2012).  The Court must examine whether the choice of cy pres recipient furthers "(1) the objectives of the underlying statute(s) and (2) the interests of the silent class members."  Nachshin v. AOL, LLC, 663 F.3d 1034, 1039 (9th Cir. 2011).  It must also account for the geographic distribution of the class."  Id. at 1040.

The parties have agreed that any unclaimed funds remaining in Fund A one year after the distribution from Fund A commences shall be paid to a cy pres recipient

chosen by this Court.  (Doc. No. 228-5 at 6.) The parties have failed to agree upon a cy pres recipient, however, delegating the choice to this Court.  (Id.)

The parties have proposed several potential cy pres recipients; Plaintiffs advocate for either the National Employment Law Project ("NELP") or, alternatively, the St. Christopher Truckers Development and Relief Fund ("SCF"). (Doc. No. 228-5.)  Defendants reject these recipients, claiming that these recipients would benefit plaintiffs' counsel more than silent class members.  (Doc. No. 228-6.) Furthermore, Defendants argue that naming one of these potential recipients might imply that Plaintiffs were, in fact, misclassified as independent contractors, going against the spirit of the Settlement Agreement, whereby Defendants do not admit to liability.  (Doc. No. 228-6.)  Defendants argue that the silent class members are more likely to benefit if the cy pres recipient was the United Way.  (Doc. No. 228-7.)  Plaintiffs argue that the United Way is not sufficiently geographically tailored to the silent class, and does not have a close enough nexus to the plaintiff class.  (Doc. No. 228-8.)

Having reviewed the cy pres options presented to the Court, the Court selects Plaintiffs' proposal for the National Employment Law Project to serve as the cy pres recipient.  This organization appears to most directly serve the underlying purposes of the FLSA, and will also provide silent class members with assistance related to the issues raised by this litigation.  The other potential cy pres recipient candidates, while worthy, do not share as a close a relationship to the facts of this case as NELP, an organization with a specific goal of protecting litigants similar to Plaintiffs against the abuses alleged in this lawsuit.  See Nachshin, 663 F.3d at 1041 (suggesting that a cy pres recipient for a class action settlement in unlawful online advertising case

United States District Court
Central District of California

could be "any number of non-profit organizations that work to protect internet users from fraud, predation, and other forms of online malfeasance."); <u>Dennis v. Kellogg Co.</u>, 697 F.3d 858, 867 (9th Cir. 2012) ("[A]ppropriate *cy pres* recipients are not charities that feed the needy, but organizations dedicated to protecting consumers from, or redressing injuries caused by, false advertising" in a false advertising class action); <u>Spann v. J.C. Penney Corp.</u>, 211 F. Supp. 3d 1244, 1261 (C.D. Cal. 2016) (approving of the National Consumer Law Center as a cy pres recipient since its "work with respect to consumer protection and unfair and deceptive acts and practices provides the requisite nexus to the interests of the class members, the nature of [plaintiffs] claims, and the purpose of the underlying statutes").

## B. The Proposed Forms and Method of Notice to Class Members are Fair and Accurate.

"For a proposed settlement under the FLSA, the court must provide potential plaintiffs accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether or not to participate." <u>Goodwin v. Winn Mgmt. Grp. LLC</u>, No. 115CV00606 DAD (EPG), 2017 WL 3173006, at *13 (E.D. Cal. July 26, 2017) (internal quotation marks removed); 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

The Court has reviewed the Settlement Agreement's proposed method for providing notice to Fund A Claimants and Potential Fund B Claimants, and the proposed notices, and the proposed consent form to opt-in to Fund B. (Settlement

Agreement at §2.12, Exhs. B-1, B-2, C.)  These notices appear to be appropriate. They describe the terms of the settlement, describe the attorneys' fee amount, gives details about how to object or opt-out, give instructions regarding mail delivery of the necessary forms, and give the contact information of the Settlement Counsel, Getman, Sweeny & Dunn PLLC, for any questions about the Settlement.  The Court finds that this notice method is sufficient.

## IV.    CONCLUSION

After weighing the factors above, the Court grants preliminary approval to the Settlement Agreement.  The Court GRANTS Plaintiffs' Motion for Preliminary Settlement Approval.

The Court schedules a Final Fairness Hearing on the question of final approval of the proposed settlement for March 26, 2018 at 2:00 p.m. at the First Street Courthouse, Courtroom 8A, 8th Floor, 350 West 1st Street, Los Angeles, California 90012.

**IT IS SO ORDERED.**

Dated:    11/9/17

Virginia A. Phillips
Chief United States District Judge